J-A21041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF C.L., A MINOR : IN THE SUPERIOR COURT OF
                                 : PENNSYLVANIA
                                 :
APPEAL OF: B.L., FATHER          :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 : No. 918 EDA 2021

Appeal from the Order Entered March 17, 2021
In the Court of Common Pleas of Monroe County Orphans' Court
at No:  55 OCA 2020

BEFORE:   KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    Filed: October 28, 2021

Appellant, B.L. ("Father"), files this appeal from the order entered March 17, 2021, in the Monroe County Court of Common Pleas, granting the petition of the Monroe County Children and Youth Services ("MCCYS" or "the Agency") to involuntarily terminate Father's parental rights to his minor, male child, C.L., born in October 2018 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm.

The trial court summarized the procedural and factual history as follows:

> This case begins the day after [Child]'s birth [in October 2018].  On October [], 2018, [the] Agency received a referral because Mother and [Child] tested positive for Amphetamines and Marijuana.   [Child]  was  placed  in  [E]mergency  [P]rotective

---

[*] Former Justice specially assigned to the Superior Court.

[1] Pursuant to the same order, the court terminated the parental rights of Child's mother, J.A. ("Mother").  Mother did not file a separate appeal and is not a participating party to the instant appeal.

[C]ustody on October 15, 2018 and held to be dependent on October 25, 2018; being subsequently placed in the home with Mother. Mother was offered JusticeWorks services to assist in receiv[ing] drug treatment services. Mother, however, was not compliant and so the services were terminated. In the Spring of 2019[,] Mother began to comply with services, allowing access to the home, and was working on her goals. Consequently, dependency of [Child] was terminated on April 12, 2019.[2]

However, on October 2, 2019, [the] Agency received a new referral that Mother was arrested with [Child] in the car, where she was found to be in possession of a large quantity of Methamphetamines and Heroin and was charged with a DUI and Reckless Endangerment. . . . The police placed [Child] with [his godmother, M.C.] ("Godmother"). After being bailed out of prison, Mother went to Godmother's home and took [Child]. [Child]'s whereabouts were unknown until October 21, 2019[,] when law enforcement found [Child] in the vehicle with Father who was driving around purportedly committing crimes. Emergency Protective Custody was then granted by [the court]. . . . On October 23, 2019[,] a Shelter Care Hearing was held . . . with protective custody being continued. . . . On November 8, 2019[,] a Dependency Adjudication Hearing was held and [Child] was found to be dependent in need of the care and supervision of the [c]ourt.[3]

. . .

_____

[2] On April 15, 2019, the court adopted a Recommendation for Termination of Court Supervision docketed April 15, 2019.

[3] Father pled guilty to charges in Monroe County, including Fleeing and Attempting to Elude, Theft by Unlawful Taking of Movable Property, Criminal Mischief Damage Property, for which he was scheduled to be sentenced on May 17, 2021. He further faced charges in Luzerne County, including Recklessly Endangering Another Person, Fleeing or Attempting to Elude an Officer, Careless Driving, and Safety Restraints Child Under 2, and Failure to Carry a License, as well as federal charges. As a result, Father was incarcerated throughout much of Child's second dependency and remained incarcerated at the time of the termination hearing. N.T., 3/9/21, at 8-7, 13, 24, 27, 29, 34, 39-40, 44-45; *see also* Agency Exhibit 17; *see also* Permanency Review Order, 3/9/21; *see also* Permanency Review Order 9/21/20; *see also* Recommendation-Permanency Review, 3/5/20.

Trial Court Opinion ("T.C.O."), 5/14/21, at 1-2 (citations to record omitted).

Throughout the next year, the court conducted regular permanency review hearings, finding that both Mother and Father achieved minimal compliance with the permanency plan and minimal progress toward alleviating the circumstances which necessitated placement. **See** Permanency Review Order, 9/21/20; **see also** Recommendation-Permanency Review, 3/5/20. As such, the court maintained Child's commitment and placement.[4] Notably, on September 21, 2020, the court changed Child's permanent placement goal to adoption. **See** Permanency Review Order, 9/21/20; **see also** Notes of Testimony ("N.T."), 3/9/21, at 45.[5]

Thereafter, on November 19, 2020, the Agency filed a petition for the termination of parental rights. The court eventually held a hearing on March 9, 2021. Mother was present and represented by counsel. While not present, Father was also represented by counsel.[6] Child was represented by a guardian

---

[4] While initially placed in foster care, Child was moved to kinship foster care with his godmother on November 27, 2019, where he remained at the time of the termination hearing. N.T., 3/9/21, at 12, 21, 45.

[5] Neither Mother nor Father appealed the goal change order. Of significance, while not incorporated in the record at the termination hearing, the court included the dependency record related to Child as part of the certified record.

[6] We observe that both Mother and Father were represented by the same counsel, Gerald Brunell, Esquire.

*ad litem*.[7]  The Agency presented the testimony of employees, Michele Haydt,[8] Supervisor, Permanency Services Unit, and Cassandra Gehr, current caseworker.  Additionally, Mother testified on her own behalf.

By order dated March 12, 2021, and entered March 17, 2021, the court terminated Mother's and Father's parental rights 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[9]  Thereafter, on April 13, 2021, Father, through counsel, filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue for our review: "1) Did the [c]ourt err when it terminated the Parental Rights of Biological Father due [sic] solely based upon his incarceration?"  Father's Brief at 7.[10]

---

[7] Child's guardian *ad litem* expressed agreement with the termination of parental rights.  N.T., 3/9/21, at 72 ("I'm in agreement with the termination of parental rights, Your Honor.").  She additionally submitted a brief in favor of termination of Father's parental rights to this Court.

[8] While Ms. Haydt's first name is spelled differently in the Notes of Testimony, Agency documents in the dependency record reflect a correct spelling.

[9] In its Rule 1925(a) Opinion, the court addresses 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b) as it relates to Father.

[10] Despite being stated broadly and without reference to Section 2511(a) and (b), we determine that Father challenges the sufficiency of the evidence with regard to grounds for termination under Section 2511(a) and (b).  **See Commonwealth v. Laboy**, 594 Pa. 411, 415, 936 A.2d 1058, 1060 (2007) (holding that this Court erred in determining that the appellant had failed to adequately develop, in his Rule 1925(b) statement, the claim that the evidence was insufficient to support his conviction).  However, as to his argument in his brief, without specifying a subsection, Father suggests a focus on subsection (a)(1).  As such, Father failed to preserve a challenge related
*(Footnote Continued Next Page)*

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free

_____

to subsections (a)(2), (5), and (8), as well as subsection (b), by failing to present argument related thereto in his brief. We, therefore, find that Father waived such claims. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa.Super. 2017).

Nevertheless, as indicated *infra*, we need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Further, "w[e] . . . may uphold a decision below if there exists *any* proper basis for the result reached." *Weber v. Lynch*, 346 A.2d 363, 366 n. 6 (Pa.Super. 1975), *affirmed*, 375 A.2d 1278 (Pa. 1977) (citing *Hayes v. Wella Corp*., 309 A.2d 817 (Pa. Super. 1973)). Thus, we conduct the requisite bifurcated analysis and review Section 2511(a)(2) and (b) within and determine that termination was proper and, had Father preserved these challenges, we would have found they lacked merit.

to make all credibility determinations and resolve conflicts in the evidence."

***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

"[I]f competent evidence supports the trial court's findings, we will affirm even

if the record could also support the opposite result." ***In re Adoption of***

***T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis

of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have

defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." ***In re***

***C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of***

***Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d at 384. Here, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (internal citation omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (quoting *In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011)). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, *supra* at 1105 (quoting *In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

In *In re Adoption of S.P.*, 616 Pa. 609, 47 A.3d 817 (2012), our Supreme Court, in addressing Section 2511(a)(2), concluded,

incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 328-29, 828; *see also In re D.C.D.*, 629 Pa. 325, 346-47, 105 A.3d 662, 675 (2014) (holding that incarceration prior to the child's birth and until the child was at least age seven renders family reunification an unrealistic goal and the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow court's initial directive that reunification efforts be made). The Court in *S.P.* further stated,

[W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). *See e.g. Adoption of J.J.,* 515 A.2d [883, 891 (Pa. 1986)] ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re*] *E.A.P.,* 944 A.2d [79, 85 (Pa.Super. 2008)](holding termination under Section 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

*In re Adoption of S.P.*, 47 A.3d at 830 (footnote omitted).

Instantly, in finding grounds for termination of Father's parental rights pursuant to subsection (a)(2), the trial court reasoned:

To terminate parental rights pursuant to § 2511 (a)(2), the petitioner must establish: "(1) repeated and continued incapacity

... ; (2) such incapacity ... has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and, (3) the causes of the incapacity ... cannot or will not be remedied." [***In re D.L.B.***], 166 A.3d 322, 327 (Pa.Super. 2017)(quoting [***In re Adoption of C.D.R.***], 111 A.3d 1212, 1216 (Pa.Super. 2015).

Father's repeated and continued incarceration during most of [Child]'s life clearly establishes the first element of the instant section regarding repeated and continued incapacity.

Concerning the second element, a parent's incarceration may be dispositive of the issue of whether a parent's incapacity causes the child to lack the essential care, control, or subsistence required. [***In re Adoption of S.P.***, 47 A.3d 817, 830 (Pa.Super. 2012). The Superior Court further informs us that the essential care contemplated by the statute includes "not only the willingness and ability to address the child's nutritional, hygienic, and medical needs but also encompasses the child's emotional well-being." [***In re S.M.B.***], 856 A.2d 1235, 1241 (Pa.Super. 2004). [Child], having special needs, needs a stable and nurturing environment where he can receive assistance and services to overcome his developmental delays and achieve permanence in his life. Returning to Father's repeated and continued incarceration, such has made it impossible for Father to meet [Child]'s nutritional, hygienic, medical, or emotional needs. Given that Father's incarceration may be extended even further after his sentencing on May 15, 2021,[11] Father is unable to provide for the developmental needs of [Child], as they relate to his delays in speech/communication, during this critical developmental period of the child's life. A failure to be able to attend to a child's developmental needs will invariably have consequences on his/her emotional health. Therefore, although Father has availed himself to visitations as regularly as possible, his inability to attend to provide [Child] the necessary assistance with respect to his developmental delays outweighs such actions.

Given Father's extensive criminal history during the time of [Child]'s life, the [c]ourt is convinced that the causes of his

---

[11] Upon review of the criminal docket sheets, presented as Agency Exhibit 17, Father's sentencing in Monroe County was scheduled for May 17, 2021. ***See*** Agency Exhibit 17. The outcome is unknown.

incarcerations cannot or will not be remedied within a reasonable time to soundly meet the many needs of [Child].

T.C.O., 5/14/21, at 10-11.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). Significantly, the record reveals Father's extensive criminal history. **See** Agency Exhibit 17. As a result of the incidents surrounding Child's second dependency and subsequent events related thereto, Father pleaded guilty to charges in Monroe County, including Fleeing and Attempting to Elude, Theft by Unlawful Taking of Movable Property, Criminal Mischief Damage Property, for which he was scheduled to be sentenced on May 17, 2021.

Father also faced charges in Luzerne County, including Recklessly Endangering Another Person, Fleeing or Attempting to Elude an Officer, Careless Driving, and Safety Restraints Child Under 2, and Failure to Carry a License, as well as federal charges.[12] Father was initially in and out of custody and reported enrollment in a rehabilitation facility.[13] However, he was

---

[12] Father additionally had prior charges in Wayne County for which he was previously incarcerated. N.T., 3/9/21, at 44-45; **see also** Agency Exhibit 17.

[13] As to Father's enrollment in a rehabilitation facility, Michele Haydt, Supervisor, Permanency Services Unit, MCCYS, testified:

On November 20 of 2019, [the Agency caseworker] called White Deer Run. She was informed there was no counselor there by the name of Pam, which was the name [Father] had given. They also stated that they did not have a patient there under [Father]'s name. They did state he had been there prior, but he wasn't currently there. The caseworker then called another rehab, Cove

*(Footnote Continued Next Page)*

incarcerated in December 2019 and has remained incarcerated since. N.T., 3/9/21, at 4-8, 11, 13, 24, 27, 29, 34, 39-40, 44-45; *see also* Agency Exhibit 17; *see also* Permanency Review Order, 3/9/21; *see also* Permanency Review Order 9/21/20; *see also* Recommendation-Permanency Review, 3/5/20.

As reported by Michele Haydt, Supervisor, Permanency Services Unit, MCCYS, "[Father] stated that he believed he would be serving quite a bit of time for his criminal charges and he also had charges from Luzerne County that he would need to take care of as well." N.T. at 13. As such, it is unknown how long Father will remain incarcerated.

Father's contact with the Agency, as well as Child in the absence of visitation, was sparing.[14] *Id.* at 18-19, 21-22, 26, 29-30, 40, 54-55; *see also* Agency Exhibit 10. However, while the evidence revealed that Father made known his desire for visitation, this became difficult due to the COVID-19 pandemic and logistical issues as a result of Father's incarceration. N.T. at 13, 19, 29-35, 38-40, 51. Similarly, despite a lack of evidence as to any services received, Ms. Haydt and current Agency caseworker, Cassandra Gehr, confirmed that they sent both parents correspondence inquiring as to whether

_____

Forge, and he was not a patient there either[,] so we weren't sure where he was.

*Id.* at 11.

[14] Agency caseworker, Cassandra Gehr, confirmed that Father did not write letters or do anything in the absence of interaction via visitation with Child. *Id.* at 21-22.

each parent was receiving services or completing drug and alcohol treatment programs. *Id*. at 18-19 ("She did[. S]he sent letters to them at the correctional facility to find out if there were any services, any programs they could be involved in while they were there. . . ."); 40 ("I did[. ]I mailed him a letter asking if he was receiving services. . . ."); *see* Agency Exhibit 10.

It is thus speculative when and if Father will be in a position to care for Child. This prospect is unacceptable for Child, who, at the time of the hearing, had already been in care for almost a year and a half, particularly given Child's developmental delays. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272.

Moreover, the record supports the trial court's finding that Father cannot or will not remedy this situation. We are mindful of our standard of review set forth above, and reiterated in *S.P.*, and, most recently, in *In re S.K.L.R.*, ___ Pa.___, 256 A.3d 1108, 1127, 1129 (2021), and that we must not

substitute our judgment for that of the trial court. As we discern no abuse of discretion, we do not disturb the trial court's findings.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

- 14 -

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In determining that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b), the trial court stated:

> . . .Proof that the parents of [Child] have not provided for his physical needs is self-evident, given the consistent incarceration of both parents for much of the child's life. Although both parents have in differing degrees met or otherwise sought to meet their duty of providing love for [Child] in the form of visits, the duty to provide comfort, security, and stability still remains unaccomplished. Being in prison for much of their lives they have been unable to bring the security and stability that [Child] needs, especially in light of the emerging information regarding his developmental delays.
>
> Additionally, there is no evidence of a bond between [Child] and Mother or Father. As such, this [c]ourt will infer that no such bond exists. This inference further bolsters the conclusion that it is in the best interest of [Child] that rights be terminated because he has already formed a close bond with his foster family. The foster family has gone much further than providing love to [Child], also providing for his physical needs, comfort, security, and stability, and much needed assistance toward his developmental delays. As an example of the assistance provided, the foster mother has gone as far as to compile a list of signs that [Child] was using, share it with the Justice Works agency, which was eventually forwarded over to Mother.

Consequently, we find the Agency to have met its burden of proving by clear and convincing evidence that Mother and Father should have their parental rights involuntarily terminated.

T.C.O., 5/14/21, at 17-18 (citations to record omitted).

As to Section 2511(b), upon review, we likewise discern no abuse of discretion. Instantly, there is no evidence of any bond between Father and Child. It was thus reasonable for the trial court to infer that no bond exists. *See In re K.Z.S.*, 946 A.2d at 762-63. Notably, Child, almost two and a half years old at the time of the termination hearing, has been in placement since he was one year old. N.T., 3/8/21, at 8-10, 21, 45.

While Child was found with Father, who was arrested, at the time of placement, Child was previously placed in the physical custody of Mother. *Id.* at 3-4, 7-8; *see also* Recommendation for Termination of Court Supervision, 4/15/19; *see also* Order of Adjudication and Disposition, 10/30/18. We are unable to decipher the full extent of Father's whereabouts and relationship with Child during this time until placement, essentially Child's first year. Despite commencing visitation in February 2020, Father's visitation with Child, which was via video, was interrupted for extended periods of time due to the COVID-19 pandemic as well as logistical issues related to Father's incarceration. N.T. at 15, 19, 21, 26, 29-35, 38-40, 51, 54-55.

Moreover, and more importantly, the current Agency caseworker, Cassandra Gehr, recognized that Child had been in his kinship placement, which was a "long-term" resource, for a year and a half. N.T., 3/9/21, at 45. As to his relationship with his foster family, Ms. Gehr described, "He is very

bonded to the foster family. They have a really good relationship and he's making a lot of progress within the last few months."[15] *Id.* at 49.

Thus, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental

___

[15] As Child was not saying any words, he was referred for an early intervention evaluation. N.T., 3/9/21, at 10, 14-15, 22; *see also* Agency Exhibits 2, 4, 5. Eventually, early intervention was approved for speech therapy. *Id.* at 24-26. In the meantime, Child's doctor also referred him for outpatient speech therapy. *Id.*; *see also* Agency Exhibit 2. Despite a lack of progress with his speech, Child started to learn and utilize sign language in order to communicate. *Id.* at 27, 30. Child additionally received physical and occupational therapy, ultimately discontinuing physical therapy. *Id.* at 34, 37, 40, 43; *see also* Agency Exhibit 2. Notably, Child's godmother/foster mother further reported sensory issues for which the doctor expressed concerns of autistic behaviors. *Id.* at 34-35, 43. It was also noted that Child's lack of eye contact had regressed. *Id.* at 42-43. As explained by Agency caseworker, Cassandra Gehr, "Foster mom will notice that [Child] becomes flustered and he'll start flapping his hands, throwing his arms around, he continued to love the fleece and will often rub it on his face or stick it in his mouth. He'll spin in circles, do things like scramble his cars repeatedly and he does not like anybody touching his head or his face." *Id.* at 43.

duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/28/21